# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 29, 2010

## ROBERT ALLEN CRAWFORD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Washington County**
**No. 31826      R. Jerry Beck, Judge**

**No. E2009-01441-CCA-R3-PC - Filed September 14, 2010**

The petitioner, Robert Allen Crawford, appeals the Washington County Criminal Court's denial of post-conviction relief and claims that his convictions of first degree murder, criminally negligent homicide, aggravated burglary, aggravated assault, and reckless endangerment were the results of the ineffective assistance of trial counsel. Following an evidentiary hearing on the petitioner's timely petition for post-conviction relief, the criminal court denied relief. Upon our review of the record and the parties' briefs, we affirm the order of the criminal court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Robert Allen Crawford, Tiptonville, Tennessee, pro se.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This court affirmed the petitioner's convictions, and our supreme court denied permission to appeal. *See State v. Robert Allen Crawford*, No. E2003-00627-CCA-R3-CD (Tenn. Crim. App., Knoxville, Mar. 9, 2004), *perm. app. denied* (Tenn. 2004). The facts underlying the petitioner's convictions were summarized in *Robert Allen Crawford* as follows:

On the afternoon of June 22, 1999, the [petitioner],

Robert Allen Crawford, whose estranged girlfriend, Diana Hatley, had appeared in court earlier that day on a domestic abuse charge against him, fired two shotgun blasts through the door of the trailer home that Hatley's father, Billy Ricker, shared with his longtime companion, Linda Leopold, and their disabled daughter, Georgia Ricker. At the time of the incident, Hatley, who was Ricker's daughter from a previous marriage, was also in the home. The [petitioner]'s first shot went through the doorknob. The second shot went through the door and into Ricker's abdomen, causing his death.

Unable to gain entry through the front door, the [petitioner] broke a window, entered the house with his shotgun in hand, smashed furniture in the front room, and began beating Hatley and threatening to kill her, Leopold, and Georgia Ricker. Hatley fought back, struggling with the [petitioner] over the gun and eventually managing to wrest it from his grasp and run out the front door. Upon seeing sheriff's deputies outside, the [petitioner] fled through the back door and into a nearby field, where he was captured.

*Id.*, slip op. at 1-2. Ms. Leopold testified at the petitioner's trial that "[e]arly on the morning of the shooting, the defendant came to Ricker's home and pushed his way into Hatley's bedroom." *Id.*, slip op. at 2. Ricker ordered him to leave, and the defendant complied. Ms. Leopold described the petitioner's return to the home while Ricker and Hatley were attending court "on a domestic abuse charge that Hatley had filed" against the petitioner. *Id.* The petitioner entered through the back door, and Ms. Leopold instructed him to leave. She testified that the petitioner pulled a shotgun shell from his pocket and said, "Well, I got this for her. If I can't have her, nobody else can." Ms. Leopold testified that she did not "smell any alcohol" on the petitioner. *Id.*, slip op. at 2.

Upon Ricker's and Hatley's return to the home, they discovered that the telephone wire had been cut. *Id.*, slip op. at 3. Later, the petitioner came onto the front porch with a shotgun, and Ms. Leopold and Ricker went out to meet him. Ms. Leopold testified that, when Ricker could not persuade the petitioner to put down the shotgun, she and Ricker retreated inside and locked the front door. *Id.* "The first shot went through the doorknob and burned her hand. Ricker pushed her aside, and the second shot struck him." *Id.* Ms. Leopold testified that the petitioner broke out a window, entered the home through the window, and "'started busting up everything in the front room.'" *Id.* As Hatley confronted the petitioner and the two struggled for control of the shotgun, the petitioner beat Hatley, said

-2-

that "she had made him kill her father," and threatened to make her watch him kill Ms. Leopold and Georgia Ricker before he killed her as well. *Id*. Eventually the women fled the house and called the police. *Id*.

The responding law enforcement officers testified about apprehending the petitioner as he attempted to flee the residence. The petitioner was not armed, but an officer found a 16-gauge shotgun shell in the petitioner's front pocket. *Id*., slip op. at 4. Officers found a shotgun at the scene that "was loaded, cocked, and ready to fire." *Id*. One officer testified that the petitioner smelled strongly of an alcoholic beverage. *Id*. A neighbor testified that after he heard the shots at Ricker's home, he found a whiskey bottle and cigarette butts near an area of "'mashed down'" vegetation around the house that was next to Ricker's home. *Id*.

A deputy sheriff testified to taking the following statement from the petitioner:

On 6/22/99 I went to Billy Ricker's house on L.C. McKee Road. It was about 3 p.m. I backed my truck up a driveway that is just before Billy's house. It is for sale. I sat in the driveway for a while and drank Jack Daniels. I got out of the truck. I had a shotgun and shells that I took with me. I went across the road into the field that is next to Billy's house. I went thru [sic] the field and crossed the fence. I took some wire pliers and cut the phone lines. I went around the front and went up on the porch. I knocked on the door and told them I wanted to talk to Diana. They would not let me in. I tried to open the door but it was locked. I shot the door. I tried to shoot the door handle. I unloaded the gun and put in a new shell, out of my front pocket. I busted the window out and went in. Billy grabbed the shotgun and we fell over the table. We fought in the living room and kitchen. Billy got the gun away and threw it. Diana picked it up and said, "I'll kill you – you son of a bitch." I threw her a new shell, because it had went off when Billy and I was fighting. Diana got the shell, loaded the gun and fired. Billy went down. Linda hollered, "You all have killed Billy." I don't remember what all happened after that. I remember trying to get out. I don't remember getting out and I don't remember any law. They must not have had their lights on. I would remember that. I don't remember leaving the trailer. I remember my eyes burning and remember someone saying, "Why did you run?"

-3-

The shotgun was Billy's but I had it in my truck for a while. I had stopped yesterday at the gun shop on 11-E next to Bottoms Up, just outside of Jonesborough. I stopped there on my way to Billy's and bought the shells. There were some shells in my truck but those are 12-gauge. I had to buy a box of 16-gauge.

I didn't mean to shoot Billy. I went to Diana's to talk to her. I took the shotgun to Billy's – not to hurt anyone but to hurt myself. If I was going to hurt anyone, Diana would have been the first one.

*Id.*, slip op. at 5-6. The officer acknowledged on cross-examination that the petitioner smelled of alcohol at the inception of the interview, when he began his first statement, and the reason they terminated the interview at that time was because they feared he was intoxicated. The State presented proof that the petitioner bought 16-gauge shotgun shells approximately two hours before the shooting. *Id.*, slip op. at 6.

Ms. Hatley testified and essentially reiterated Ms. Leopold's description of the petitioner's assaultive conduct. *Id.* During her struggle with the petitioner for the shotgun, the petitioner said, "'Linda has to die, Georgia Ann has to die, and then you're going to die.'" *Id.* Ms. Hatley recounted that Ricker was pleading for help and that the petitioner stomped on the victim's head until he stopped trying to get up. At one point while the petitioner was distracted, Ms. Hatley took the shotgun and fled the house. *Id.*, slip op. at 7.

A forensic pathologist who performed the autopsy on the victim's body testified that the victim bled to death from a shotgun wound to his abdomen and pelvis. The wound contained insulation material that appeared identical to fibers from the trailer's front door. *Id.*

The petitioner's former girlfriend testified on his behalf that he was a "good-hearted person" whom she had never known to be violent. *Id.* She also testified that the petitioner had difficulty hearing. The petitioner's mother testified that he had learning disabilities, was hard of hearing, and that his grandfather and father had both committed suicide. *Id.* She testified that the petitioner had been depressed before the shooting and had mentioned suicide. She opined that the petitioner had always gotten along well with Ricker. *Id.*

In *Robert Allen Crawford*, this court narrated the petitioner's trial testimony as follows:

-4-

The [petitioner] testified he had had learning problems all of his life and had difficulty hearing. He said he had known Ricker eight years and had always gotten along well with him. He stated that he met Hatley in 1998 and fell in love with her within the first week of their acquaintance. He said Hatley drank every day, "took quite a few pills," and occasionally smoked marijuana. Although they got along well when sober, they argued whenever they drank.

On the night before the shooting, the [petitioner] was riding with his mother in her car when he saw Hatley speed past him driving his black Ford pickup truck. The [petitioner] said he was concerned because Hatley was driving drunk in his truck without insurance. After following Hatley for awhile and then losing her, he and his mother drove to Ricker's house, where he retrieved his truck and had a conversation with both Ricker and Hatley. The [petitioner] testified Ricker told him Hatley was an alcoholic and he should leave her alone because she would always cause him problems. The [petitioner] said, however, that he was not ready to give Hatley up.

The [petitioner] testified he had a job interview the morning of the shooting at a place Hatley had put in an application as well. He said Hatley told him during their conversation the previous evening that she wanted to accompany him on his interview. However, when he stopped by Ricker's home that morning to pick her up, "she was totally a different person" and told him she no longer wanted to be with him. The [petitioner] said he was so hurt and depressed that he went home and started drinking, ignoring his job interview. At about 10:45 a.m., he left home and went to the courthouse in Johnson City, where a woman told him he was not supposed to be in court until 1:30 p.m. He got back in his truck "and started drinking and went down on the river."

The [petitioner] testified he did not remember buying the shotgun shells. He said he had no intention of killing anyone, and there was no significance to the number of shells the box contained. He remembered backing his truck into the driveway of the vacant home but only "bits and pieces" of what else

-5-

occurred. He did not remember going to the house and talking to Leopold, cutting the telephone wires, or later walking onto the porch of the residence and confronting Ricker and Leopold with the shotgun. He also did not remember firing the shotgun through the door but said it was possible he had. He was confident, however, that he would not have done so in an attempt to get inside the house. The [petitioner] testified he could have entered through the back door because he knew from previous visits to the home that the lock on that door was broken and the door could be secured only by placing a broom handle in the trough. He offered the following explanation for firing his shotgun at the front door:

> If I'd have shot – the only thing that I could think of would be the reason I'd have shot the door was just to get Diana to come out to talk to me to where we could see if we could work our relationship out, maybe to kill myself in front of her, to hurt her like she had hurt me, to – far as I know that was all I could know the reason I could have fired the shotgun.

The [petitioner] said he had no memory of breaking the window with the shotgun, and the only thing he remembered while inside the house was sitting at the kitchen table and talking with Hatley.

The [petitioner] reiterated on cross-examination that he had no memory of having shot the door. He also testified he did not remember Ricker screaming at him to put the gun down but said if Ricker had, he might not have heard Ricker because of his hearing deficit. He denied it was possible to see through the glass window in the door that someone was standing behind the door.

*Id.*, slip op. at 7-8.

In *Robert Allen Crawford*, this court explained that

[t]he trial court merged the conviction for criminally negligent

-6-

homicide with the conviction for first degree murder, and the defendant received concurrent sentences of life for the first degree murder conviction, four years for the aggravated burglary conviction, three years for the aggravated assault conviction, and one year for the reckless endangerment conviction.

*Id*., slip op. at 1.

In the petitioner's petition for post-conviction relief, he claimed that his trial counsel had been ineffective in failing to develop a "psychological" defense based upon the petitioner's low intelligence quotient ("IQ") and his use of alcohol at the time of the offense. He also claimed that trial counsel failed to present a defense of diminished capacity to form the requisite intent to commit the crimes of which he was convicted, communicated with the petitioner inadequately prior to trial, failed to investigate the case, failed to cooperate or interact with co-counsel, and failed to take steps to enable the petitioner to hear properly during trial preparations and trial.

In the February 22, 2008 post-conviction hearing, one of the petitioner's trial attorneys, who we will refer to as associate counsel, testified that she was appointed to assist lead counsel because of her familiarity "with clients that had communication problems." She testified that she made several calls to lead counsel to arrange a meeting with him but that he did not return her calls. She also testified that she went to lead counsel's office once and left a message with his receptionist to have him call associate counsel. She recounted, "I had a very difficult time communicating with him. Not with our client, with [lead counsel]." She testified that when she would contact lead counsel, he would typically say, "I'll get back with you," which he never did.

Associate counsel testified that she copied the court file on the petitioner's case and reviewed and copied the district attorney general's file. She went to and photographed the crime scene. She testified that she interviewed the petitioner in the jail on at least three occasions. She described the interviews as lengthy.

Associate counsel testified that, on one occasion, she located lead counsel in a bar and grill near his office and spoke with him "maybe three minutes about the case." Lead counsel declined her request to return to his office to discuss the case. She testified that she told lead counsel that the petitioner's mental evaluation was "very relevant to the case and needed to be pursued." She testified that she never met lead counsel at his office. She located him at the same bar and grill on two other occasions. In the first of those meetings, lasting five to eight minutes, they discussed "in-depth" the petitioner's hearing problem, and associate counsel told lead counsel that the petitioner needed hearing aids. She testified that

lead counsel filed a motion requesting that the petitioner be furnished with hearing aids. She said that the trial court granted the motion. In the last encounter at the bar and grill, associate counsel conversed with lead counsel about 15 minutes about the hearing aids that were being provided. She testified that lead counsel told her that the audiologist involved was a friend of his and that he would take care of arranging for the petitioner's being fitted for the hearing aids. She further testified that she told lead counsel at that time that she was looking for a truck driver who may have seen the petitioner on the day of the shooting.

She testified that she later "located a driver of a dump truck . . . [who] could testify as to the state of mind that [the petitioner] was in at [the] time [of the shooting] and the level of intoxication, at least by his actions." She attempted to pass this information to lead counsel but only had "access" to him on four occasions despite her "numerous calls and attempts to meet him to discuss the case." She testified that she had no further communication with lead counsel between the third encounter at the bar and grill and the first day of trial. They did not discuss division of labor, trial strategy, or the preparation of witnesses, including the petitioner should he elect to testify. She testified that the petitioner told her that lead counsel was not communicating with him during this time.

Associate counsel testified that she came to court on the first day of trial after only learning of the trial date through the newspaper at 7:00 that morning. When she arrived, she discovered that the petitioner "did not have the hearing devices that had been approved." She testified that lead counsel told her the devices "were not important." She agreed with post-conviction counsel that, in her opinion, the petitioner had a serious hearing deficit, one that required her to "make eye contact with him and speak slowly with him."

Associate counsel agreed with post-conviction counsel that the petitioner's mental evaluation indicated the petitioner had a "tremendous mental deficit." She exhibited the 2000 mental evaluation report of Doctor Eric S. Engum to her testimony.

Associate counsel opined that the defense was not ready for trial when the trial date arrived, and she testified that she told lead counsel as much. She said that lead counsel introduced her to "a very nice young lady" who "was looking at going to law school and wanted to see what a case would be like." Lead counsel told associate counsel that the young woman was the daughter of a local attorney and "was going to sit at the counsel table with us." Associate counsel testified that the young woman "would have been nice to look at . . . she was a very attractive young woman." Associate counsel advised the trial judge that, in her opinion, the defense was not ready for trial and that she "would not go forward." She said that if "the case was going to go forward, [she] needed to be allowed to withdraw." After lead counsel assured the trial judge that he was ready for trial, the judge allowed associate counsel to withdraw.

-8-

On cross-examination, associate counsel agreed that, at the time she represented the petitioner, she had participated in no criminal trials – felonies or misdemeanors – as lead counsel, but she stated that she had been "second chair" in one or two homicide cases. She agreed that, in recent years, she had ceased practicing criminal law.

She testified that she left her trial notebook at the court when she withdrew from the case and did not recall the name of the truck driver she had interviewed. She testified that the truck driver had told her that he had seen the petitioner near the scene of the crime and that the petitioner was intoxicated. She stated that she did not subpoena the truck driver as a witness because she did not learn of the trial date until the "morning of trial in – when [she] looked in the newspaper." She said she learned of the commencement of trial at about 7:00 a.m. on the first day of trial. She testified that she had made no attempt to get information about the trial date because she was "depending on [lead counsel] to inform [her], since [she] was co-counsel."

Associate counsel testified that her work on the petitioner's case was *pro bono* and that she did not file any claim for attorney fees. She agreed that she did not know the extent of lead counsel's preparation in the case. She further agreed that because she left the court immediately after being allowed to withdraw, she had no knowledge of lead counsel's performance at trial.

At this point, the post-conviction court interrupted the February 22, 2008 evidentiary hearing to express concern that the petitioner was attending court without the benefit of a hearing aid or listening device. Based upon his concern that the petitioner could not fully participate in the proceeding due to his hearing impairment, the judge adjourned further proceedings until the petitioner's hearing problems could be addressed. The evidentiary hearing did not resume until January 8, 2009.

On this date, associate counsel again took the stand and was questioned by post-conviction counsel. She testified that she had experienced a stroke in September 2008 and struggled to remember some things. Associate counsel's January 8, 2009 testimony reiterated much of her earlier testimony. On January 8, 2009, she stressed that, as of the morning of trial, she and lead counsel had engaged in "[a]bsolutely" no discussion about whether the petitioner would testify at trial. She referred to the truck driver witness she interviewed concerning the petitioner's state of intoxication on the day of the shooting and to two other possible witnesses who may have had similar information. She opined that "in [her] professional opinion, the [petitioner] could not have received a fair trial, an adequate defense, without those witnesses being interviewed and without our client having the hearing device he was entitled to have so he could participate."

Following cross-examination by the State, associate counsel responded to questions from the post-conviction court about her appointment as co-counsel on the petitioner's case. She testified, "The [trial] judge felt like there was a need for someone that could communicate with our client, and he felt I was the appropriate person to do that."

Novella Black, the petitioner's mother, testified that in preparation for her trial testimony, lead counsel had only asked her about whether the petitioner had a proclivity to violence. She testified that lead counsel neither consulted with her about the petitioner's background nor about his drinking habits. She said that lead counsel spoke with her for about 15 minutes when he first took the case and did not speak with her again until the day of trial. She testified that lead counsel did not prepare her to be cross-examined. She stated that she furnished the name of a witness, Frankie Carter, who had seen the petitioner intoxicated on the day of the shooting and that Ms. Hatley told the petitioner's grandmother that Ms. Hatley was going to "put a black spider in Ricker's coffee sometime to – to collect his insurance." She testified that lead counsel said, "I'll check into it."

She agreed that the petitioner wore headphones during the trial but claimed that they were "them little old things that they'd bought at the Walmart."

The petitioner testified that, following the February 22, 2008 portion of the post-conviction hearing, he had been furnished hearing aids at state expense and agreed that he could hear the voices in the courtroom. He testified that he had a hearing problem at the time of trial, that he was fitted for hearing aids prior to trial, and that he did not receive any hearing aids to use at trial. He agreed that he had been furnished a small amplifying box with earphones. He testified, "I couldn't hear or understand all of what they was saying." He said he could hear the judge and counsel but had difficulty hearing the testimony from the witness stand.

The petitioner testified that he stayed in jail until his trial and that lead counsel only visited him once when he was first appointed in the case and once "right before the trial." He testified that each meeting lasted 15 or 20 minutes. He agreed that he and lead counsel discussed in the second meeting whether the petitioner would testify. He testified that he told counsel that he did not want to testify and that counsel responded that he did not have to. He said that he assumed after the meeting that he would not testify and that it surprised him when he was called to the stand. He stated that he had not been prepared for testimony and was sent to the stand with only the last-minute instruction, "Just answer the best you can and look at the jury."

On cross-examination, the petitioner testified that lead counsel never asked what had happened on the day of the shooting. He testified that counsel "more or less told

me what happened." He agreed that he did speak to lead counsel on those occasions when he appeared in court for pretrial proceedings. He maintained that he did not want to testify at trial and that he did not know until after the trial that he could have refused to testify.

He testified that whenever he told lead counsel that he was having difficulty understanding what was being said during trial, counsel "would say, 'That don't matter. Don't worry about it. I'll tell you later.'"

The petitioner testified that lead counsel did not discuss with him a possible mental health defense. He did recall being evaluated by a mental health professional.

Steven Robert Finney testified for the State that he had practiced law since 1989, had worked as an assistant district attorney general for 13 and one half years, had engaged in a private criminal practice since 2005, and had participated in 80 to 100 jury trials. The State tendered Mr. Finney as an expert in the field of criminal law. The post-conviction court declined to rule that Mr. Finney was generally an expert in the entire field of criminal law but agreed that if the State laid groundwork to ask Mr. Finney to render opinions on specific issues, it would rule upon the admissibility of the opinions.

Mr. Finney testified that he was the lead prosecutor in the petitioner's homicide case. He recalled that either the petitioner's lead counsel or that counsel's predecessor[1] in the case filed a number of motions and that the petitioner was sent for a mental evaluation. He recalled going to the scene of the crime with his investigator and both lead and associate defense attorneys. Mr. Finney recalled that it was a "tough case" for the petitioner and that "[i]t was a good case for the State based on the facts and the law." He opined that lead counsel "did as good as anyone could have done under the circumstances." Mr. Finney testified that the jury deliberated for a day and a half because, he believed, lead counsel "gave them some stuff to think about."

Mr. Finney testified that he was surprised that the jury deliberated that long because the petitioner was charged both with felony and premeditated first degree murder, and Mr. Finney thought that the decision to convict of one or the other would be easy. He stated that the jury "hung" on a count "where [the petitioner's] girlfriend was the victim." Mr. Finney testified that lead counsel tried to show that had the girlfriend "not have . . . led [the petitioner] on and done these things, that her father wouldn't be deceased." Mr. Finney said he thought "that was a really good – I mean, I really to this day think that was a good defense." Mr. Finney pointed out that on the premeditated murder count, the jury convicted

---

[1]Mr. Finney testified that the public defender had initially been appointed to represent the petitioner but had been relieved due to a conflict. Lead counsel was then appointed.

the petitioner of the lesser included offense of criminally negligent homicide. Mr. Finney opined that lead counsel was prepared to defend the petitioner.

On cross-examination, Mr. Finney agreed that it is important to interact with co-counsel to get the benefit of another viewpoint.[2]

Lead counsel testified that he was licensed to practice law in 1998 and participated in his first jury trial in a criminal case in 1999. Prior to 2002, 90 to 95 percent of his practice was in criminal law. He testified that by 2002 he had participated in approximately 10 jury trials although the petitioner's case was his first murder case.

Counsel testified that in the petitioner's case he first went to the jail to interview his client. He testified that he went back to see him once or twice more. He obtained discovery materials from the district attorney general's office and reviewed them. He testified that the petitioner was evaluated at Lakeshore Mental Health Institute in Knoxville and stayed there about 30 days. He testified that he reviewed the voluminous medical reports emanating from the evaluation. He testified that he visited the homicide scene with associate counsel and talked to Ricker's neighbor. He said he prepared a trial notebook that included questions for direct and cross-examinations. He testified that he "was ready."

Counsel testified that he paid particular attention to the petitioner's mental ability and the issue of a diminished capacity defense. He testified that, in addition to going through the medical records, he discussed the defense with the members of the public defender's staff who had worked on the case previously. He said, "I just decided we didn't have a defense there. There wasn't any evidence in the record to – to support that kind of defense." He opined that, although he knew the petitioner's IQ was 70, the petitioner "seemed intelligent. He carried on a conversation without any problems. . . . He had ideas about things."

Counsel testified that a major point of concern for him was whether the

_____

[2]During the cross-examination of Mr. Finney, counsel for both sides and the judge discussed the use of the trial record by the post-conviction court. Preferring not to review a "2,000 page transcript," the post-conviction judge, who was not the trial judge, agreed to allow counsel to submit specific citations to the record that they respectively wished the court to review. At times during the post-conviction hearing, counsel and the judge specifically referred to this court's rendition of facts in *Robert Allen Crawford*. At the end of the hearing, the post-conviction judge clarified with counsel that they were going to submit and stipulate any excerpts from the trial record that they separately deemed relevant. At one point, the petitioner's counsel stated, "I think I've got a copy of [the trial transcript]." Counsel stated that he would lend the copy to the prosecutor.

petitioner understood the felony murder rule. He stated that the petitioner kept maintaining that he did not mean to kill Ricker and that this position influenced the petitioner not to plead. He testified that second degree murder was the best offer the State made and that the petitioner rejected the offer because he did not intend to kill Ricker. Counsel believed that, eventually, the petitioner understood that "they had alleged aggravated burglary as their underlying felony for the felony murder rule, that he was going to get convicted, whether he meant to kill [Ricker] or not. And he understood that." Counsel stated that the petitioner "wanted to roll the dice."

Upon reviewing some of the petitioner's mental health records, counsel recalled that none of the evaluators discerned any basis for his pursuing a diminished capacity defense although they did confirm the petitioner's mental retardation. The assistant district attorney general read into the post-conviction hearing record a portion of Exhibit 3, a letter dated September 6, 2001, from "Middle Tennessee Mental Health." In pertinent part, the letter stated not only that "the defense of insanity cannot be supported" but also that the petitioner's "mental condition was not so impaired that he . . . would be unable to premeditate or to act with intent." Counsel opined that a mental health defense "just wasn't there." Also, counsel testified that he discussed the possibility of such a defense with the petitioner, and the petitioner "did not want to use that as a defense."

Counsel testified that he was aware of the petitioner's hearing deficiency but that he "didn't have any trouble communicating with [the petitioner]." Counsel recalled that, although arrangements had been made to obtain hearing aids for the petitioner, the petitioner "never got transported from the jail to the audiologist, so he didn't get his hearing aids." He testified that either he or his secretary bought

> a portable amplifier that had earphones attached to it. And when we came down to trial I had that. And we put it on the table there. And we even switched tables with the prosecution so he could be right in front of the witness stand just in case there was any problem. But he wore these earphones. . . . I remember very distinctly on the record Judge Cupp was very thorough about questioning him, and whether this – this amplifier helped him hear, and whether he understood what was going on. And he was fine. He could hear everything.

Counsel testified that the petitioner expressed "[n]ot a word" to him during the trial about being unable to hear.

Counsel denied that he ever heard anything about a truck driver who had

observed the petitioner in an intoxicated state on the day of the shooting. Nevertheless, counsel minimized the effect of such a witness because his theory of defense was that the petitioner, in entering Ricker's home, intended only to talk to Ms. Hatley and did not intend to commit any felony. As such, counsel maintained, the felony murder charge was undercut by the absence of a predicate felony.

Counsel testified that he met with the petitioner at the jail a day or two before trial and discussed whether the petitioner would testify. He stated that the petitioner recounted the events preceding the shooting but that, when the petitioner testified, he surprised counsel by stating that he did not remember those events. Counsel opined that the defense had made headway with the jury until the petitioner claimed he did not remember what happened. Counsel testified that the petitioner understood his constitutional rights regarding his decision to testify and that they discussed the advantages and disadvantages. Counsel stated, "[I]f he had told the jury the same thing that he told me in the same manner, I think he would have come out better. But he, for whatever reason, decided not to do that." Counsel did agree, however, that had he had it to do over, he might have filed "some kind of motion for . . . an independent expert to – to examine [the petitioner]." At the time, however, he thought there was no point in doing so.

Counsel testified that he had conversations with the petitioner's mother but that he did not recall her telling him about any witnesses to investigate. Counsel agreed that he used the petitioner's mother to introduce evidence of the petitioner's background, but he stated that he had to be careful because the petitioner "had done this before. . . . [H]e had been rejected by a woman before and he had gone out to his truck and pulled out a shotgun and fired the – fired a round into her house," resulting in an aggravated assault guilty plea. Counsel stated also that, approximately six months before the shooting of Ricker, the petitioner "stuck a shotgun to Ms. Hatley's head over when they were living in North Carolina," resulting in a domestic assault charge. Counsel testified that he tried to "build sympathy" and had "to be careful about a lot of this stuff because [he] didn't want the jury hearing about that."

The State introduced into evidence lead counsel's fee petition, and he agreed that it reflected meeting with the petitioner on "multiple occasions," that he met with the petitioner's mother for 1.3 hours, and that he spent a considerable amount of time preparing for trial, including interviewing all of the State's witnesses except for Ms. Hatley. He testified that part of his strategy was "to put as much of the blame on – for this killing on [Ms. Hatley] as [he] could, because she wasn't a very sympathetic figure. . . . She . . . used a lot of drugs. . . . [S]he took advantage of [the petitioner] emotionally."

On cross-examination, lead counsel denied that he had any problem working

-14-

with associate counsel and commented, "She just didn't do anything." He testified that "early on we had a couple of conversations about [the case], and she said she was going to do things, and she didn't follow up." Lead counsel testified that he began not "pay[ing] much attention to her when we went down to the crime scene." Counsel claimed that, at the scene – where Ms. Leopold lived, associate counsel was "abrasive and impolite" to Ms. Leopold. Lead counsel testified that he realized that if associate counsel "acts like that in front of a jury we're dead before we start." After that, the two lawyers did not contact each other, but lead counsel maintained nevertheless that he was prepared for trial.

Lead counsel testified that he did not remember associate counsel's making arrangements for the petitioner's hearing aids. He testified that she had mentioned getting hearing aids for the petitioner "and then didn't follow through with it." Lead counsel denied that he had ever known anyone "in the audiology business."

Counsel testified that he had voluntarily relinquished his license to practice law after not responding to complaints filed with the Board of Professional Responsibility. He testified that he agreed to a five-year disbarment.

On June 15, 2009, the post-conviction court entered its order denying post-conviction relief and containing its written findings and conclusions of law. The court made "general finding[s]" including that it accredited the testimony of lead counsel over that of the petitioner. We will review the particular factual findings and conclusions of law as we address the petitioner's issues presented for appellate review.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first whether "the advice given, or the services rendered by the attorney, are within the range of competence demanded of attorneys in criminal cases," *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

On appeal, the petitioner raises four issues of ineffective assistance of counsel.

*I. Failure to Request a Jury Instruction on Voluntary Intoxication*

This issue as framed by the petitioner to address jury instructions on voluntary intoxication was not presented in the amended post-conviction petition, was not raised in the post-conviction hearing, and was not ruled on *per se* by the post-conviction court. Thus, the issue of whether trial counsel was ineffective for failing to request a jury instruction on voluntary intoxication is not before the court. *See Walsh v. State*, 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); *State v. Adkisson*, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994) ("[A] party will not be permitted to assert an issue for the first time in the appellate court.").

Moreover, the transcript of the post-conviction hearing reveals that the parties, through counsel, orally stipulated that the jury was instructed on voluntary intoxication, and the post-conviction court seemed to include the stipulation in its findings. We have no record before us that shows otherwise.

The petitioner has demonstrated no entitlement to relief upon the claim that his

trial counsel did not request a voluntary intoxication jury instruction.

## II. Failure to Cooperate with Associate Counsel and to Investigate and Present the Testimonies of Three Witnesses Regarding the Petitioner's Voluntary Intoxication

The post-conviction court determined that lead counsel was entrusted with strategic and tactical decisions at trial and that essentially his failure to utilize the services of associate counsel did not indicate *per se* that lead counsel's performance was deficient. The court further found that evidence of the petitioner's intoxication at the time of the crimes was well developed. The court determined that the testimony of other witnesses would have been redundant on the issue of intoxication.

We glean from the post-conviction court's conclusions that, as between the two lawyers representing the petitioner pretrial, only lead counsel was in a position to know the defense's state of readiness for trial. The record, via lead counsel's testimony, contained evidence of lead counsel's active preparation for trial. Typically, a client's interests are better served when his two attorneys cooperate and communicate with each other, but in the present case, the petitioner failed to show that he was prejudiced by lead counsel's marginalizing of associate counsel.

The claim that lead counsel did not investigate witnesses to the petitioner's intoxication and did not call the truck driver to testify is equally unavailing. A post-conviction petitioner generally fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness to the post-conviction court; a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The petitioner did not call the truck driver or any other putative trial witnesses to testify in the post-conviction hearing. Accordingly, he failed to demonstrate, at a minimum, that he was prejudiced by his counsel's inaction on this issue.

## III. Failure to Develop a Mental Health Defense

Concerning the petitioner's claim that counsel failed to mount a mental health defense, the post-conviction court relied upon the absence of any mental health expert testimony in the evidentiary hearing and denied relief on this issue.

We discern from the record that the petitioner is limited intellectually; however, the petitioner failed to prove by clear and convincing evidence the viability of any mental impairment defense. He called no witnesses to establish the merits of any such defense, and we cannot speculate about whether any expert testimony would have advanced such a

defense at trial. *See id.* Consequently, the petitioner established no prejudice in counsel's failure to pursue a defense of mental impairment.

Additionally, lead counsel, whose testimony was accredited by the post-conviction court, testified that he reviewed all of the evaluative reports and discussed a possible diminished capacity defense with the petitioner's former counsel. Based upon the record, lead counsel informed himself about the petitioner's mental limitations, articulated reasons based upon his information for not pursuing a diminished capacity defense, and made the strategic choice not to pursue such a defense. As mentioned above, we defer to tactical or strategic decisions of counsel when the choices are made after adequate preparation. *Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528.

*IV. Failure to Obtain a Hearing Device for the Petitioner Prior to Trial*

In addressing this claim, the post-conviction found that no proper hearing aids were purchased for the petitioner before trial; however, the trial court physically rearranged the parties in the courtroom to afford the petitioner proximity to the witness stand. The post-conviction court found that, once the trial began, the petitioner made no complaint that he could not hear. On this basis, the court held that the petitioner failed to show that he was prejudiced by any deficient performance of trial counsel.

The record supports the trial court's conclusion in this regard. Although the petitioner and his former associate counsel testified that his hearing was impaired, no clinical evidence was offered to establish the extent of the impairment or the inefficacy of the measures employed at trial to address the issue. Absent such evidence, the State's evidence that measures were taken at trial and that the petitioner did not complain that he could not hear the proceedings, combined with the court's accrediting this testimony, supports the conclusion that the petitioner failed to carry his burden of showing by clear and convincing evidence that counsel was ineffective in failing to take further action to address his hearing problem.

*V. Conclusion*

Our conclusion is that the record supports the post-conviction court's determination that the petitioner failed to establish ineffective assistance of counsel by clear and convincing evidence. Accordingly, that court's order is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE